UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

ROSA I. MOJICA,

                       Plaintiff,

             v.

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.

-----------------------------------------------------------X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>November 17, 2014</u> |

13 Civ. 5631 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge[1]:

      Plaintiff Rosa I. Mojica, proceeding *pro se* and *in forma pauperis*, filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision of the Acting Commissioner of Social Security (the "Commissioner"), which decision denied Plaintiff's application for Supplemental Security Income ("SSI") benefits based on a finding that Plaintiff was not disabled under the Act. Defendant has moved for judgment on the pleadings; Plaintiff has filed no response. Because the Commissioner's decision is supported by substantial evidence, Defendant's motion is granted.

---

[1]      E. Grace Davis, a third-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

## BACKGROUND[2]

### A.    Plaintiff's Impairments

Plaintiff is a 38-year-old woman who claims that she is unable to sustain full-time work due to mental health problems.  She filed for a disability determination on September 8, 2010.  (SSA Rec. 132-38).  She reported the onset of her disability as December 1, 2005.  (*Id.* at 132).  In her application, she stated that her condition has worsened since June 2010 and that she has increased limitations.  (*Id.* at 155 ("I am not able to concentrate, [I] see people, [I] [hear] people.  [M]y entire body is shaking.")).

Plaintiff completed a function report on November 29, 2010, as part of her disability application.  (SSA Rec. 162-69).  In that report, Plaintiff indicated that she did not have any physical limitations.  (*Id.* at 167-68).  She reported no problems caring for herself and admitted that she routinely engages in household activities, such as laundry, cooking, and grocery shopping.  (*Id.* at 164-65).  She also reported that she regularly attends church, speaks to her immediate family on a daily basis, and gets along with friends, family, and neighbors.  (*Id.* at 166).  In that same report, Plaintiff reported feeling anxious in public and withdrawing from her friends.  (*Id.* at 163, 167).  She also reported problems with her memory, difficulty maintaining focus, and an inability to complete tasks.  (*Id.* at 168-69).

---

[2]     The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #13), which was filed by the Commissioner as part of her answer.  For convenience, Defendant's supporting memorandum is referred to as "Def. Br."

At Plaintiff's hearing, she testified that she has been suffering from a variety of psychological ailments for many years, including depression, anxiety, mood swings, and hallucinations. (SSA Rec. 55). She testified that her hallucinations sometimes threaten her or instruct her to commit suicide. (*Id.*). Additionally, Plaintiff testified that she has suffered from seizures, and that she has been prescribed a drug called Topamax to control these seizures. (*Id.* at 57-58).[3]

## B.    Plaintiff's Medical Evaluations

### 1.    Physical Ailments

Plaintiff does not allege that her physical ailments entitle her to SSI benefits. (*See* SSA Rec. 155). Because the Commissioner took Plaintiff's physical ailments into account in rendering the decision, a brief summary will be provided nonetheless.

In March 2004, Plaintiff received x-rays on her pelvis, cervical spine, and both hips from Lincoln Medical and Mental Health Center in the Bronx for "pain." (SSA Rec. 230). Tests revealed no fractures or dislocations. (*Id.* at 230-32). In December 2007, Plaintiff had surgery on an anal fistula with no reported complications. (*Id.* at 251, 254, 256).[4] On August 6, 2008, Plaintiff

---

[3]    Topamax is also referred to in the record by its generic name, Topiramate. (*See, e.g.*, SSA Rec. 58).

[4]    "A fistula is an abnormal connection between an organ, vessel, or intestine and another structure." Fistula, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/002365.htm (last visited Nov. 16, 2014).

was diagnosed with Bell's palsy.  (*Id.* at 244-45, 260).[5]  In June 2010, Plaintiff went to the Jacobi Medical Center in the Bronx, complaining of right arm weakness.  (*Id.* at 313).  She received a computerized tomography ("CT") scan, which indicated "no acute intracranial finding," and a magnetic resonance imaging ("MRI") test, which was "negative" except for "mild abnormal right facial nerve enhancement."  (*Id.* at 350).

Plaintiff has an extensive history of gynecological issues.  Between 2008 and 2009, she had two operations on her cervix.  (SSA Rec. 308-10).  Between 2009 and 2010, she was treated for fibroids in her uterus.  (*Id.* at 352-55).  She has a history of menstrual pain, and has reported having surgery on ovarian cysts.  (*Id.* at 447).

**2.     Psychological Ailments**

**a.      The Reports of Plaintiff's Treating Professionals**

Plaintiff began receiving outpatient psychological treatment at Behavioral Healthcare Services ("BHS") in the Bronx on June 24, 2010.  (*See* SSA Rec. 444).  During the intake assessment on June 24, 2010, Plaintiff reported having a 10-to-15-year history of depression that she had managed up to that point with medication, although the particular medication had made her feel "very groggy."  (*Id.*).  She indicated that she had discontinued taking the medication two months prior to seeking treatment at BHS.  (*Id.*).  She also

---

[5]      "Bell's palsy is a form of temporary facial paralysis resulting from damage or trauma to one of the facial nerves."  Bell's Palsy, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/bells/bells.htm (last visited Nov. 16, 2014).  Symptoms range from weakness of the face to total paralysis.  The prognosis is generally very good, and the extent of recovery depends on the extent of the damage to the nerves.  Most patients recover completely within three to six months.  *Id.*

reported new symptoms, including increased anxiety, irritability, and tearfulness, and she mentioned seeing "shadowy figures" and having auditory hallucinations. (*Id.*). Plaintiff noted that she had recently ended a long-term romantic relationship, and had lost her job as a result of her "virtually continuous crying." (*Id.*). The intake clinician diagnosed Plaintiff with major depressive disorder, noting that it was recurrent and severe with psychotic features, and generalized anxiety disorder. (*Id.* at 450). The clinician also assessed a Global Assessment of Functioning ("GAF") of 65. (*Id.*).[6]

Plaintiff received outpatient treatment at BHS between June 24, 2010, and November 30, 2011. (SSA Rec. 368-454). During that time, Plaintiff had three treating psychiatrists: Dr. Victoria Iglanloc (from June to August 2010); Dr. Minta Spain (from September 2010 to March 2011); and Dr. Joshua Mason (from April 2011 to November 2011). (*Id.*). She also had two counselors for outpatient psychotherapy sessions: Debbie Ann Chambers and Ellen Keenan. (*Id.*).

Dr. Iglanloc evaluated Plaintiff on July 21, 2010, and July 28, 2010. (SSA Rec. 439-43). Dr. Iglanloc initially diagnosed Plaintiff with major depressive disorder with psychotic features and made a "rule out" notation for schizoaffective disorder, depressive type. (*Id.* at 441).[7] On July 28, 2010, she

---

[6]    A GAF of 61 to 70 represents "mild symptoms." (Def. Br. 7 (citing *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) ("*DSM-IV*")).

[7]    Although a "rule out" notation may appear on a patient's chart alongside diagnoses, such a notation does not constitute a diagnosis. *See Santiago* v. *Colvin*, No. 12 Civ. 7052 (GBD) (FM), 2014 WL 718424, at *13 (S.D.N.Y. Feb. 25, 2014), *report and recommendation adopted*, 2014 WL 1092967 (S.D.N.Y. Mar. 17, 2014); *accord Merancy* v. *Astrue*, No. 10 Civ. 1982 (MRK) (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3,

diagnosed Plaintiff with schizoaffective disorder, depressive type, determined that Plaintiff was "stable," and assessed a GAF of 45 to 50.  (*Id.* at 440).[8]  Dr. Iglanoc also prescribed Klonopin for anxiety.  (*See id.*).[9]  This treatment plan remained consistent for the rest of Plaintiff's sessions with Dr. Iglanloc.  (*Id.* at 431-36).

The next psychiatrist Plaintiff visited was Dr. Spain, who evaluated Plaintiff on nine occasions: August 17, 2010, August 25, 2010, September 1, 2010, October 4, 2010, November 8, 2010, November 29, 2010, December 13, 2010, December 21, 2010, and January 24, 2011.  (SSA Rec. 420-30).  On the first occasion, Dr. Spain met only "briefly" with Plaintiff when Plaintiff ran out of medication and Dr. Spain agreed to renew on the condition that Plaintiff schedule and attend an appointment.  (*Id.* at 430).  At their follow-up meeting, Dr. Spain reported that "all [Plaintiff] wanted to do was pick up her medication," and that Plaintiff vehemently advocated for an increased dosage of Klonopin.  (*Id.* at 428).  After meeting with Plaintiff, Dr. Spain increased the dosage of Klonopin, diagnosed Plaintiff with schizoaffective disorder, made a

---

2012), *report and recommendation adopted*, No. 10 Civ. 1982, Dkt. #28 (D. Conn. May 22, 2012).  The "rule out" notation is used where a doctor has insufficient information to form a diagnosis, but wants to indicate in the patient's file a need to eliminate or exclude a diagnosis from consideration in the future.  *See Santiago*, 2014 WL 718424, at *13.

[8]     A GAF of 41 to 50 represents "serious symptoms or functional limitations."  (Def. Br. 7 (citing *DSM-IV* at 34)).

[9]     Klonopin is also referred to in the record by its generic name, Clonazepam.  (*See, e.g.*, SSA Rec. 298).

"rule out" notation for major depression with psychotic features, and assessed a GAF of 50. (*Id.* at 428-29).[10]

Between October 4, 2010, and November 8, 2010, Plaintiff did not meet with Dr. Spain, though she did contact Dr. Spain by phone for a prescription renewal. (SSA Rec. 427-29). Dr. Spain next saw Plaintiff on November 8, 2010, and reported that Plaintiff had been taking a higher than prescribed dose of Klonopin. (*Id.* at 426). Dr. Spain reported talking to Plaintiff about the addictive nature of Klonopin and the need to discuss medication use. (*Id.*). Nonetheless, Dr. Spain increased Plaintiff's Klonopin prescription on December 21, 2010, after Plaintiff complained that the medication was not controlling her symptoms (*id.* at 422), and again on January 24, 2011, after Plaintiff had a "shaking" episode during the appointment consisting of crying and shaking of her legs, which episode subsided after a few minutes (*id.* at 420). At no point during or after these appointments did Dr. Spain diagnose Plaintiff with having anything more than "mild" symptoms related to her psychological state. (*See id.* at 420-28).

Plaintiff next received care from Dr. Mason, who treated Plaintiff on seven occasions: April 8, 2011, May 3, 2011, June 14, 2011, July 13, 2011, August 10, 2011, September 9, 2011, and October 7, 2011. (SSA Rec. 368-69, 375-76, 378-79, 383-84, 392-93, 397, 403, 411-12). Plaintiff was "hostile and defensive" during the first meeting. (*Id.* at 411). On May 3, 2011, Plaintiff arrived one day early for her scheduled appointment and was "anxious and

---

[10]    A GAF of 41 to 50 represents "serious symptoms or functional limitations." (Def. Br. 7 (citing *DSM-IV* at 34)).

7

irritable." (*Id.* at 403).  On June 14, 2011, Plaintiff admitted to taking her Klonopin more often than intended and Dr. Mason decided to taper off Plaintiff's Klonopin usage.  (*Id.* at 397-98).  According to Dr. Mason's report, it was "difficult to engage" with Plaintiff because of her hostility.  (*Id.* at 397).

Throughout his time with Plaintiff, Dr. Mason diagnosed her with schizoaffective disorder, and made "rule out" notations for major depression with psychotic features, and for bipolar disorder.  (SSA Rec. 375, 378, 382, 392, 397, 403, 411).  On five occasions, Dr. Mason made "rule out" notations for "benzo[diazepine] dependence."  (*Id.* at 375, 378, 383, 392, 397).  On November 30, 2011, Dr. Mason stated in his report that he suspected malingering, given that Plaintiff's only goals at the appointment were to receive an increased dosage of Klonopin and assistance in filling out her SSI papers. (*Id.*).

In addition to seeking treatment with psychiatrists, beginning in 2011, Plaintiff also visited two clinicians for psychotherapy.  Plaintiff saw Debbie Ann Chambers on six occasions.  (SSA Rec. 389-420).  Chambers first attended one of Plaintiff's treatment sessions with Dr. Spain on March 8, 2011.  (*Id.* at 420). Chambers wrote a letter to the Social Security Administration dated the same day, stating that Plaintiff had been diagnosed with schizoaffective disorder and that her symptoms included "auditory and visual hallucinations of a paranoid nature and emotional disturbance, that is, severe anxiety and depression." (*Id.* at 210).  Chambers treated Plaintiff on March 11, 2011, and provided Plaintiff with a letter to support her SSI application.  (*Id.* at 416).  During her next

visit — on March 25, 2011 — Plaintiff "seemed to want to talk mostly about medication." (*Id.* at 413). During her visit on July 27, 2011, Plaintiff asked Chambers for help in filling out her SSI application, which Chambers provided. (*Id.* at 389).

On July 26, 2011, Chambers completed a clinic assessment update. (SSA Rec. 387). In the report, Chambers stated that Plaintiff "does not want to engage in therapy." (*Id.*). Chambers noted (i) Plaintiff's "history of non-compliance with psychotherapy from the beginning of her treatment at [the Outpatient Division]"; (ii) her absenteeism; (iii) her sometimes "hostile and defensive" attitude toward therapy; (iv) her "dependen[ce] on ... Klonopin[,] taking more than prescribed and experiencing severe anxiety, including panic attacks and physical trembling, when she does not have her medication"; and (v) her "use[] [of] psychotherapy to receive help to fill out her SSI application." (*Id.* at 386).

Plaintiff was transferred from Chambers to social worker Ellen Keenan on August 26, 2011. (SSA Rec. 380). In the transfer summary, Chambers noted Plaintiff's "non-complian[ce]" with psychotherapy. (*Id.*). In particular, the summary stated that "the focus of sessions was primarily related to case management — including assisting with SSI applications" — and that Plaintiff was unwilling to do cognitive behavior therapy assignments designed to relieve her anxiety. (*Id.*).

Plaintiff saw Keenan on two occasions: September 13, 2011, and November 22, 2011.  (SSA Rec. 370, 377).[11]  In their introductory session, Plaintiff reported to Keenan that she believed past psychotherapy sessions were "useless because no one did anything for her … [to] [a]ssist with SSI, rent."  (*Id.* at 377).  At their next session, Plaintiff brought her SSI paperwork to the appointment.  (*Id.* at 370).  Keenan reported explaining that she could not assess Plaintiff's workplace ability, but would complete other parts of the application.  (*Id.*).  Keenan's refusal to assess workplace ability reportedly angered the Plaintiff, who stated that "[Keenan and Dr. Mason] should understand that mentally she is unable to work."  (*Id.*).  In her report from that same meeting, Keenan stated that Plaintiff showed her a $900 electricity bill with a "turn-off notice" dated for the previous week.  (*Id.*).  Keenan reported spending the entire remainder of the session helping Plaintiff with her financial problems.  (*Id.* at 370, 459).  Keenan reported that Plaintiff "visibly appeared ungrateful" for the effort.  (*Id.* at 370).

Throughout her outpatient treatment sessions, Plaintiff continuously missed appointments without any notification.  Plaintiff missed two appointments with Dr. Iglanoc, two appointments with Dr. Spain, and two appointments with Dr. Mason.  (*See* SSA Rec. 371-73, 407, 421, 425, 437-38, 472).  Additionally, Plaintiff missed nine scheduled psychotherapy sessions, despite repeated voice-mail reminders and despite several discussions with her

---

[11]    Keenan reported that she "met" Plaintiff on three occasions; however, on the third occasion, "[Plaintiff] arrived 30 minutes late for her app[ointment]," such that Keenan was "unable to see her" for treatment.  (SSA Rec. 459-60).

physicians about her irregular attendance.  (*See id.* at 374, 382, 385, 389-91, 394, 399-404, 408-10, 417).

None of Plaintiff's treating professionals would assess Plaintiff's ability to work, defined in the context of SSI applications as her "residual functional capacity" (or "RFC").[12]  Keenan chose not to complete a medical source statement of the Plaintiff's ability to do work-related activity, citing "infrequent contact."  (SSA Rec. 459-60).  Dr. Mason also refused to assess Plaintiff's RFC on a medical source statement of ability to do work-related activity dated November 16, 2011.  (*Id.* at 455-56 ("I have *not* evaluated p[atien]t's ability to work." (emphasis in original))).

### b.    The Reports of Plaintiff's Non-Treating Professionals

At the request of the Commissioner, Plaintiff was assessed by Dr. Dimitri Bougakov, Ph.D.  (SSA Rec. 302-05).  Dr. Bougakov interviewed Plaintiff twice: first on December 20, 2010, and second on February 3, 2012.  During the first interview, Plaintiff discussed her symptoms, including "dysphoric moods, crying spells, loss of interest, irritability, low energy, concentration difficulties and diminished sense of pleasure."  (*Id.* at 302).  She also noted that she "shakes for no reason."  (*Id.*).  Dr. Bougakov found that Plaintiff's difficulties were likely related to psychological or cognitive problems, but did not think that the results were "significant enough to interfere with [Plaintiff's] ability to

---

[12]    A claimant's RFC is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]"  *Melville* v. *Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.").

function on a daily basis." (*Id.* at 304). He found that Plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration and maintain a regular schedule, make appropriate decisions, relate to others, and handle stress. (*Id.*).

After the second interview, Dr. Bougakov completed two medical source statements: a narrative statement and a form statement that required the doctor to check various boxes to signify how Plaintiff's impairment could affect her ability to work. (SSA Rec. 462-69). In the narrative portion, Dr. Bougakov noted that Plaintiff could maintain attention and concentration, maintain a regular schedule, make appropriate decisions, and relate to others, but only "on a limited basis." (*Id.* at 464). He further noted that she was having difficulty dealing with stress "at this time," and that this stress could be "significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (*Id.* at 464-65). The form that Dr. Bougakov completed in tandem with the narrative is somewhat at odds with the narrative assessment. (*See id.* at 468-69). On the form, Dr. Bougakov did not indicate that any of Plaintiff's impairments were "moderate," "marked," or "extreme"; instead, he indicated that Plaintiff's impairments imposed "mild" (if any) limitations on her ability to do work-related activities. (*Id.* at 467-68).

Again at the request of the Commissioner, Plaintiff was assessed by Dr. Dipti Joshi, M.D., on January 13, 2011. (SSA Rec. 298-301). Dr. Joshi diagnosed Plaintiff with fibroids with tender pelvic mass, schizophrenia, panic attacks, anxiety, and depression. (*Id.* at 300). He noted that Plaintiff was in no

acute distress; he further noted that Plaintiff had a normal gait and stance, full muscle strength, full range of motion, normal reflexes, and intact hand and finger dexterity. (*Id.* at 299-300). Dr. Joshi recommended that Plaintiff avoid working from heights, operating heavy machinery, and driving until she was further evaluated for her complaint of seizures, and further recommended that she avoid strenuous activity due to the tender mass in her pelvic region. (*Id.* at 300).

Finally, and again at the request of the Commissioner, Dr. Mariano Apacible reviewed Plaintiff's medical record and completed a Psychiatric Review Technique report dated January 21, 2011. (SSA Rec. 269-82). According to Dr. Apacible, Plaintiff had mental impairments, but did not satisfy the criteria for disabling psychiatric impairments under the "Listing of Impairments" provided in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (*See id.* at 269-74). In the report, Dr. Apacible assessed the degree of Plaintiff's limitation in four functional limitation categories. According to Dr. Apacible, Plaintiff had "mild" restriction of activites in daily living; "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of deterioration, each of extended duration. (*Id.* at 279). Dr. Apacible reported that Plaintiff did not have the degree of limitation that satisfied the functional criteria for disabling psychiatric impairments in any of the four categories. (*Id.*).

Dr. Apacible also completed a Mental RFC Assessment dated January 21, 2011. (SSA Rec. 294-97). Dr. Apacible found that Plaintiff was "not significantly limited" in her ability to, *inter alia*, remember locations and work-like procedures; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and get along with coworkers without distracting them or exhibiting behavioral extremes. (*Id.* at 294-95). Dr. Apacible found Plaintiff was "moderately limited" in other areas, including understanding and remembering detailed instructions; carrying out detailed instructions; and responding appropriately to criticism from supervisors. (*Id.*). There was no category in which Dr. Apacible found that Plaintiff "markedly limited." (*Id.*).

Dr. Apacible elaborated on these conclusions in his narrative functional capacity assessment. (SSA Rec. 296). He stated that Plaintiff's allegations that she was "bipolar," that she had "schizophreni[a]," that she was a "psychopath," and that she suffered from "depression" were "not fully supported by the medical evidence in file." (*Id.*). Dr. Apacible noted that any psychiatric or cognitive problems "d[o] not appear significant enough to interfere with claimant's ability to function on a daily basis." (*Id.*). Dr. Apacible concluded that Plaintiff has the RFC for simple task, low stress work. (*Id.*).

**C.   Plaintiff's Work History**

Plaintiff has no substantial work history, and her accounts of previous jobs have been murky and inconsistent. On June 8, 2010, she reported to Dr. Talha Khawar at Jacobi Medical Center that she was then employed as a

14

waitress in a hotel in Manhattan.  (SSA Rec. 314).  Later that year, on December 20, 2010, she reported to Dr. Bougakov that she last worked four or five years ago as a babysitter.  (*Id.* at 302).  During her hearing before Administrative Law Judge ("ALJ") Moises Penalver on December 21, 2011, she testified that she last worked as a waitress at a restaurant.  (*Id.* at 54).  During that hearing, Plaintiff testified that she stopped working because she could not find child care.  (*Id.*).  However, elsewhere in the record, Plaintiff indicated that she lost her waitressing job due to crying spells.  (*Id.* at 444).  When asked during the hearing to estimate how much she had worked or how much money she had made during any job held in the past 10 to 15 years, Plaintiff was unable to do so.  (*Id.* at 54, 71).  Yet in her intake assessment at BHS a year earlier, Plaintiff reported that she made approximately $35,000 per year for approximately 10 years as a waitress.  (*Id.* at 454).  Adding further confusion to the record, the Plaintiff reported in an undated disability report that she had not worked since July of 1989 and that she had stopped working "because of my condition(s)."  (*Id.* at 187).

### D.     Social Security Administrative Proceedings

Plaintiff first filed for a disability determination on September 8, 2010.  (SSA Rec. 132-38).  The initial claim was denied on February 14, 2011.  (*Id.* at 82-86).  Plaintiff filed a request for hearing on March 14, 2011.  (*Id.* at 87-89).

A hearing was held before ALJ Penalver at which Plaintiff and her counsel were present.  (SSA Rec. 48-81).  Plaintiff testified at the hearing, as did Julie A. Andrews, an impartial vocational expert ("VE").  (*Id.* at 50-80).  On

April 26, 2012, the ALJ issued a decision finding that the plaintiff was not disabled under the Act. (*Id.* at 23-36). On April 8, 2013, the Social Security Administration ("SSA") Appeals Council denied Plaintiff's request for review. (*Id.* at 4-6).

### E.    The Instant Litigation

Plaintiff initiated this action on August 8, 2013. (Dkt. #2). Defendant filed its motion for judgment on the pleadings on April 21, 2014. (Dkt. #14). To date, Plaintiff has not filed any opposition.

**DISCUSSION**

### A.    Applicable Law

### 1.    Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)). A plaintiff is entitled to relief if she alleges "enough

16

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

Even where such a motion stands unopposed, as it does here, "the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law." *Vt. Teddy Bear Co.* v. *1–800 BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (applying this standard in the context of summary judgment); *see also Wellington* v. *Astrue*, No. 12 Civ. 3523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013); *Martell* v. *Astrue*, No. 09 Civ. 1701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010). When a plaintiff proceeds *pro se*, as Plaintiff does in this case, the Court is "obligated to construe [her] complaint liberally," *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and to "examine every claim or defense with a view to determining whether [judgment as a matter of law] is legally and factually appropriate." *Jackson* v. *Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014) (applying this standard in the summary judgment context).

## 2.   Review of Determinations by the Commissioner of Social Security

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"[A]n ALJ's credibility determination is generally entitled to deference on

appeal."  *Selian* v. *Astrue*, 708 F.3d 409, 421 (2d Cir. 2013).

A court must uphold a final SSA determination to deny benefits unless

that decision is unsupported by substantial evidence or is based on an

incorrect legal standard.  *Selian*, 708 F.3d at 417 ("In reviewing a final decision

of the SSA, this Court is limited to determining whether the SSA's conclusions

were supported by substantial evidence in the record and were based on a

correct legal standard." (citing *Talavera* v. *Astrue*, 697 F.3d 145, 145 (2d Cir.

2012))); *see also id.* ("If there is substantial evidence to support the

determination, it must be upheld.").  More than that, where the findings of the

SSA are supported by substantial evidence, those findings are "conclusive."

*Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary

are conclusive unless they are not supported by substantial evidence." (citing

42 U.S.C. § 405(g))).

"[S]ubstantial evidence" is "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Diaz*, 59 F.3d at 312 (internal quotation marks omitted).  The

substantial evidence standard is "a very deferential standard of review — even

more so than the clearly erroneous standard."  *Brault* v. *Social Security Admin.*

*Comm'r*, 683 F.3d 443, 449 (2d Cir. 2010).  To make this determination —

whether the agency's finding were supported by substantial evidence — "the

reviewing court is required to examine the entire record, including

contradictory evidence and evidence from which conflicting inferences can be drawn.  *Id.* (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 288 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

The SSA employs a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled.").  The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in

> Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [her *per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian*, 708 F.3d at 417 (citing *Talavera*, 697 F.3d at 151). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts*, 388 F.3d at 383.

## B.   Analysis

Applying the applicable standards, the Court finds no basis to overturn the Commissioner's decision that Plaintiff was not disabled under the Act. The record confirms that the ALJ's decision was based on the correct legal standard and is supported by substantial evidence.

The ALJ correctly identified the issue for determination: whether Plaintiff was disabled under Section 1614(a)(3)(A) of the Act. (SSA Rec. 26). In determining whether Plaintiff was disabled, the ALJ applied the correct legal standard by employing the requisite five-step evaluation. *See* 20 C.F.R. § 416.920(a).

### 1.   The Commissioner's Determination That Plaintiff Is Not Engaged in Substantial Gainful Activity Is Supported by Substantial Evidence

Starting with step one, whether Plaintiff is engaged in substantial gainful activity, the ALJ noted that "'[s]ubstantial work activity' is work activity that involves doing significant physical or mental activities," while "'gainful work activity' is work that is usually done for pay or profit, whether or not a profit is

20

realized." (SSA Rec. 27 (citing 20 C.F.R. § 416.972(a), (b))). If an individual

engages in substantial gainful activity, she is not disabled. (SSA Rec. 27; *see*

20 C.F.R. § 416.970(a)(4)(i)).

The ALJ determined that Plaintiff had not been engaged in substantial

gainful activity since September 8, 2010. This conclusion is well-supported by

the record and Plaintiff's testimony. Plaintiff's work history is sparse and

inconsistent, and any past work experience was extremely limited. (*See* SSA

54, 70-72, 187, 302, 314, 444, 454). During the hearing, the ALJ asked

Plaintiff to provide details of her past work experience. Plaintiff stated that,

within the preceding 10 years, she had worked for about four months as a

waitress at a restaurant. (*Id.* at 70). During that time, Plaintiff believed that

she had worked approximately three days a week, but she could not recall

precisely. (*Id.* at 72). She also could not recall whether she received a salary,

nor could she specify the amount of money that she earned. (*Id.* at 71-72).

Absent any evidence to confirm the details of her past work, the ALJ correctly

found that Plaintiff's work fell below substantial gainful activity levels. (*Id.* at

34, 72).

### 2. The Commissioner's Determination That Plaintiff's Impairments Are Severe Is Supported by Substantial Evidence

Having determined that Plaintiff was not engaged in substantial gainful

activity, the ALJ appropriately progressed to step two of the analysis. Under

step two, the ALJ assessed whether Plaintiff had a medically determinable

impairment that was "severe" or a combination of impairments that was

"severe."  20 C.F.R. § 416.920(c).  An impairment or combination of impairments qualifies as "severe" within the meaning of the regulations if it "significantly limits [one's] physical or mental ability to do basic work activities."  *Id.*  "An impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work."  (SSA Rec. 27 (citing 20 C.F.R. § 416.921; Social Security Rulings ("SSR") 85-28, 96-3p, and 96-4p)).  If a claimant does not have either a severe medically determinable impairment or a combination of impairments, she is not disabled.  *See Selian*, 708 F.3d at 417. If a claimant has a severe impairment or combination of impairments, the analysis proceeds to step three.  *See* 20 C.F.R. §  404.1520(a)(4).

The ALJ found that Plaintiff had the following severe impairments: major depressive disorder, panic disorder, generalized anxiety disorder, schizoaffective disorder, pain secondary to fibroids with tender pelvic mass, and generalized type of seizures.  (SSA Rec. 28).  The ALJ determined that the above impairments caused "more than minimal limitation on [Plaintiff's] ability to work."  (*Id.*).  The ALJ, in viewing the evidence in a light most favorable to the Plaintiff, found that the combination of these ailments imposed "more than minimal limitation on [Plaintiff's] ability to work."  (*Id.*).  The ALJ's determination is supported by substantial evidence and the Court agrees that proceeding to the next step was appropriate.

### 3.    The Commissioner's Determination That Plaintiff Is Not *Per Se* Disabled Is Supported by Substantial Evidence

Having determined that the Plaintiff has severe impairments, the ALJ moved on to step three of the analysis.  *See* 20 C.F.R. § 404.1520(a)(4).  Here, the ALJ was required to determine whether or not Plaintiff's impairment or combination of impairments is "of a severity to meet or medically equal" the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If Plaintiff's impairments, either separately or in combination, meets or equal a listed impairment in Appendix 1, and satisfies the 12-month duration requirement in 20 C.F.R. § 416.909, the ALJ must find the Plaintiff disabled.  20 C.F.R. § 416.920(d).  Here, the ALJ found that Plaintiff's impairments, either separately or in combination, did not sufficiently satisfy the criteria.  This Court agrees with the ALJ's determination.

To reach the conclusion that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the regulations, the ALJ reviewed each of Plaintiff's impairments thoroughly, beginning with her physical ailments.  First, the ALJ found that Plaintiff's history of fibroids with tender pelvic mass would be reserved as part of his assessment of Plaintiff's RFC because that impairment is not specifically addressed by a listing in the regulations.  (SSA Rec. 28).  Second, the ALJ reviewed Plaintiff's "seizures" as they related to Listings 11.02 and 11.03 (describing convulsive and non-convulsive epilepsy) and found that the record lacked evidence of the specific criteria described in the listings.  (*Id.*).  This Court agrees with that finding.  There is no medical evidence in the record that suggests that Plaintiff satisfies the conditions of either convulsive or non-

convulsive epilepsy as detailed in Listings 11.02 and 11.03 respectively.[13]  As the ALJ noted, there is "minimal" evidence of any seizure activity in the record. (*Id.*).  The incident that occurred in Dr. Spain's office, which Plaintiff volunteered as "an example of her 'shaking' episodes" (*id.* at 420), does not meet the specific requirements described in Listings 11.02 or 11.03.  Although Plaintiff testified that she was prescribed Topamax in order to help control her seizures, none of her treating physicians appears to have prescribed this medication, nor does the record otherwise explain why Plaintiff takes this medication.

Having determined that the Plaintiff did not qualify under Listings 11.02 or 11.03, the ALJ then looked to whether the severity of Plaintiff's mental conditions, either independently or in combination, meet or medically equal the criteria of "Mental Disorders" Listings 12.03 ("Schizophrenic, Paranoid and Other Psychotic Disorders"), 12.04 ("Affective Disorders") or 12.06 ("Anxiety Related Disorders").  20 C.F.R. Part 404, Subpart P, Appendix 1.  In order to make this finding, the ALJ had to determine whether Plaintiff had "medically documented persistence" of one or more of the listed symptoms ("Paragraph A" criteria), which resulted in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning;

---

[13]     Convulsive epilepsy requires "detailed" documentation of "a typical seizure pattern" that occurs more than once a month in spite of at least three months of prescribed treatment, with either daytime episodes (involving a loss of consciousness and convulsion) or nocturnal episodes which "interfere significantly with activity during the day."  20 C.F.R. Part 404, Subpart P, Appendix 1.  Non-convulsive epilepsy requires the same "detailed" documentation of episodes occurring more than once a week despite at least three months of prescribed treatment, and manifests with "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day."  *Id.*

marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration (the "Paragraph B" criteria).  If the criteria in Paragraph A and Paragraph B are not sufficiently met, a Plaintiff may still be found to be disabled if she has a medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (i) repeated episodes of decompensation,[14] each of extended duration; (ii) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (iii) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement ("Paragraph C" criteria).  20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ's determination that Plaintiff did not adequately satisfy the Paragraph B criteria is supported by substantial evidence.  First, Plaintiff has no marked restriction in the activities of daily living.  She has no physical limitations, she performs her own self-care, and she accomplishes basic chores independently.  In social functioning, Plaintiff's "moderate difficulties" are

---

[14] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Part 404, Subpart P, Appendix 1.

mitigated by factors such as her good relationship with her family and her ability to take public transportation.  Plaintiff also has "moderate difficulties" with regard to concentration, but she can count, do simple calculations, and has some ability to recall.  Finally, there is no record of any repeat episodes of decompensation of extended duration.

The ALJ's finding that Plaintiff does not satisfy the Paragraph C criteria is likewise supported by the record.  Plaintiff has not had any episodes of decompensation, she has not been been diagnosed with a residual disease process or history of dysfunction that would cause decompensation, she has not had difficulty functioning outside her home, and there is no indication that she requires a highly supportive living arrangement.

### 4.   The Commissioner's RFC Determination Is Supported by Substantial Evidence

Having rejected that Plaintiff was *per se* disabled at step three of the analysis, the ALJ correctly moved to the fourth step in the analysis, in which he considered Plaintiff's RFC to perform past relevant work.  As noted previously, RFC is defined as an individual's maximum ability to do physical or mental work despite the individual's limitations.  20 C.F.R. § 416.945(a)(1).  In assessing a claimant's RFC, the ALJ is expected to consider all "medically determinable impairments" and "all of the relevant medical and other evidence," including the intensity and persistence of claimant's symptoms.  20 C.F.R. § 416.945(a)(2), (3).  There is a two-step process for considering the claimant's symptoms: first, the ALJ must determine whether there exists "a medically determinable impairment(s) that could reasonably be expected to

produce [the claimant's] symptoms" by relying on "medically acceptable clinical and laboratory diagnostic techniques"; and second, the ALJ must make a credibility determination based on a consideration of the record regarding subjective statements about the intensity, persistence, or functionally limiting effects of symptoms not substantiated by medical evidence.  20 C.F.R. § 416.929(c).

The ALJ found that Plaintiff's medically determinable impairments could "reasonably be expected to cause the alleged symptoms."  (SSA Rec. 30). However, the ALJ further decided that Plaintiff's statements regarding the intensity, persistence, and functional limiting effects of the impairments were not credible to the extent that they indicated an inability to perform "light work."  "Light work" requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  "Light work" may involve "a good deal of walking or standing" and when it is predominantly sitting, there may be "some pushing and pulling of arm or leg controls."  *Id.*  This category encompasses "sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  *Id.*  The ALJ found that Plaintiff had the RFC to perform "light work," but noted that she should avoid exposure to dangerous moving machinery and unprotected heights, and that she should be limited to low-stress jobs involving simple, routine, and repetitive tasks, limited public contact, occasional interaction with co-workers, and occasional supervision.  The record supports the ALJ's RFC determination.

27

In assessing Plaintiff's RFC, the ALJ properly relied on the findings of Plaintiff's non-treating physicians.  Generally, an ALJ should give "more weight" to the opinions of treating physicians, although the ALJ is not precluded from giving more weight to an opinion that is "more consistent … with the record as a whole."  20 C.F.R. § 416.927(c)(2), (4).  The assessments of Dr. Apacible, Dr. Bougakov, and Dr. Joshi are the only medical opinions of record because Plaintiff's treating physicians and clinicians refused (or were not asked) to submit medical source statements addressing her ability to work. Therefore, the ALJ properly relied on the assessments of Plaintiff's non-treating physicians.  Regarding Plaintiff's physical RFC, Dr. Joshi's findings are fully consistent with the ALJ's physical RFC determination that Plaintiff can perform "light work" as defined in 20 C.F.R. § 404.1567(b).  Regarding Plaintiff's mental RFC, the ALJ was correct in incorporating the findings of Dr. Bougakov and Dr. Apacible into the RFC calculation.  Although Dr. Bougakov indicated that Plaintiff had a "limited" ability to maintain attention and concentration, maintain a regular schedule, make appropriate decisions, and relate to others, he also opined that Plaintiff's impairments resulted in — at most — mild limitations on her ability to make work-related decisions or carry out work-related tasks.  Dr. Apacible likewise found that Plaintiff had no significant limitations that would prevent her from performing a range of low-stress work activities involving simple tasks.  The findings of these professionals constitute substantial evidence supporting the ALJ's determination of Plaintiff's RFC and her capacity to perform "light work" as defined in the regulations.

Additionally, as required in assessing Plaintiff's RFC, the ALJ made a finding on the credibility of Plaintiff's subjective statements regarding her total disability based on a consideration of the entire record.  "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Genier* v. *Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted).  Here, the ALJ properly assessed Plaintiff's credibility and his findings are supported by the record.

As the ALJ found, Plaintiff's claim of total disability as a result of her symptoms is not entirely credible.  Plaintiff has minimal trouble performing daily activities: she attends to her personal hygiene, she takes public transportation, she attends church, she shops for groceries, she socializes with family, she takes care of her children, and she performs some household chores.  Furthermore, Plaintiff has been non-compliant with psychotherapy, and her contention that her inability to attend appointments is due to her mental health is not supported by the record.  Rather, her treating physicians have noted (and the entire record reflects) that she "only calls when she needs help with concrete services" (SSA Rec. 460), and she is "unwilling" to do any personal work to alleviate her symptoms (*id.* at 380).  Further undermining Plaintiff's credibility is the fact that none of Plaintiff's treating professionals, including those who had frequent contact with Plaintiff, was willing to assist

29

her in completing a medical source statement regarding her purported inability to work, despite her persistence in bringing it to their attention.  Accordingly, in determining Plaintiff's RFC and her capacity to perform "light work," the ALJ properly weighed the credibility of the Plaintiff's subjective complaints in light of the other evidence in the record.

### 5.    There Is Substantial Evidence That Plaintiff Can Perform Work That Exists in the National Economy

As Plaintiff has no relevant work experience, the ALJ correctly considered Plaintiff's RFC, age, education, and work experience in determining whether she could perform other work, and concluded that Plaintiff could perform a significant number of jobs that exist in the national economy.  *See* 20 C.F.R. § 416.920(g)(1).

The ALJ properly relied on the VE's testimony that there are a significant number of jobs that Plaintiff is able to perform.  The ALJ asked the VE hypothetical questions related to Plaintiff's ability to perform work in the national economy, given Plaintiff's vocational profile and her RFC.  Andrews testified that an individual incorporating Plaintiff's vocational profile and RFC could work in a housekeeper position, in small product assembly, and as an agricultural produce sorter.  (SSA Rec. 75-76).  Andrews further testified that there were thousands of such jobs available, both regionally and nationally. (*Id.*).  Where, as here, the record provides substantial evidence to support the findings upon which the VE's hypothetical was based, the ALJ properly relied on the VE's testimony in determining that Plaintiff could perform work that

exists in the national economy. *See Dumas* v. *Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

Having reviewed the entire record, the Court finds that the Commissioner's decision to deny Plaintiff's application for SSI benefits is free from legal error and supported by substantial evidence in the record. Accordingly, there is no reason for it to be overturned.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed and Defendant's motion for judgment on the pleadings is GRANTED. The Clerk of Court is directed to terminate Docket Entry 14, and to mark the case as closed.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated: November 17, 2014
       New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge